IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SANDRA GARDNER

       v.                        :  Civil Action No. DKC 24-454

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS,:
et al.

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of fiduciary duty case is the verified application for leave to file a complaint pursuant to 29 U.S.C. § 501(b) filed by Sandra Gardner ("Plaintiff"). (ECF No. 1). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's application for leave will be granted.

**I.  Background**

**A.  Factual Background**

The factual background of this case was described in detail in this court's earlier opinion. (ECF No. 27). In short, Plaintiff has been a member of the labor organization The International Association of Machinists and Aerospace Workers ("IAM" or "the union") since 1999. (ECF No. 24-2 ¶ 4). In 2021, Plaintiff became concerned that then General Secretary-Treasurer Dora Cervantes ("Ms. Cervantes") was using union funds for personal

travel in breach of her fiduciary duties. (ECF No. 1-1 ¶¶ 19-20).
In May 2022, Plaintiff and another IAM member wrote a letter to
the IAM President and Executive Council regarding the alleged
misappropriation of funds by Ms. Cervantes, demanding that the
union take action to obtain an accounting and garner restitution
of any misappropriated funds. (ECF No. 1-2). IAM responded to
the letter, notifying Plaintiff that IAM intended to "conduct an
investigation and analysis of [Plaintiff's] claims." (ECF No. 17-
8, at 2). The United States Court of Appeals for the Fourth
Circuit described Plaintiff's further communications with the IAM
General Counsel, Carla Siegel:

> Once again, Siegel wrote to the pair,
> informing them that WithumSmith+Brown, PC
> ("Withum"), an outside accounting firm, would
> carry out the investigation. Siegel provided
> them with the independent auditor's contact
> information and stated "[i]t is incumbent on
> you to provide [the auditor] with all
> documentation and information you have to
> assist him in his investigation of your
> claims." The union members responded to
> Siegel, reiterating their request for
> Cervantes' travel documents. Siegel, in turn,
> asked that they provide "more specificity with
> respect" to their allegations.
>
> Gardner, this time joined by two union
> members, wrote yet again to Siegel. They
> "demanded that the IAM International President
> and Grand Lodge bring suit against IP Martinez
> and GST Cervantes to recover [the
> misappropriated union funds]." They also
> asked the union to expand the accounting of
> funds to IAM's General Vice President, Mark
> Blondin, for records relating to his travel

expenses, and for the union to "take any and all necessary legal action against Dora Cervantes, Robert Martinez and Mark Blondin."

After this latest epistle, Siegel responded to Gardner and the other union member with whom she had sent the original letter. Siegel explained that, in response to their request, "IAM . . . hired . . . [an] independent accounting firm, Withum[,] to investigate your allegations [concerning Cervantes and Martinez]." "Withum concluded that there was no evidence of wrongdoing, misappropriation or abuse." Siegel's letter concluded:

The Executive Council reviewed [Withum's] report and [the union members'] demand. Based on the report, the Executive Council determined that there was simply no support for your unfounded allegations . . . . [T]he IAM has determined there is no basis for taking any further action with respect to your meritless allegations.

(ECF No. 32-2, at 3-4, *published at*, *Gardner v. Int'l Ass'n of Machinists*, 150 F.4th 221, 224 (4th Cir. 2025) (citation modified)). After the union declined to take any further action, Plaintiff sought leave of the court to file a complaint against Ms. Cervantes under 29 U.S.C. § 501 and against IAM under 29 U.S.C. § 431(c).[1]

**B.   Procedural Background**

Plaintiff filed her verified application under 29 U.S.C. § 501(b) requesting leave of the court to file her complaint on

---

[1] Count II of the proposed complaint under 29 U.S.C. § 431(c) does not require leave of the court to file.

February 15, 2024.  (ECF No. 1).  After briefing regarding the application, the court denied Plaintiff's application for leave to file on September 25, 2024, finding that Plaintiff had failed to meet 29 U.S.C. § 501(b)'s demand requirement.  (ECF No. 27, at 10).  Plaintiff appealed this court's decision to the Fourth Circuit on October 24, 2024.  (ECF No. 29).  On August 11, 2025, the Fourth Circuit reversed the decision of the court, finding that Plaintiff had satisfied the demand requirement, and remanded "for further consideration on whether [Plaintiff] satisfied the good cause requirement."  (ECF No. 32-2, at 11, 150 F.4th at 227).

The parties agreed to a supplemental briefing schedule in this court on October 8, 2025.  (ECF No. 41).  Plaintiff filed her supplement addressing the "good cause" requirement on October 22, 2025.  (ECF No. 44).  Defendants submitted a response on November 19, 2025, (ECF No. 45), and Plaintiff filed a reply on December 3, 2025, (ECF No. 46).

## II.  Standard of Review

The Labor-Management Reporting and Disclosure Act ("LMRDA") creates a cause of action against union officials who violate their fiduciary duties.  29 U.S.C. § 501.  Section 501(a) of the LMRDA describes the fiduciary duties of a labor organization's officers, and § 501(b) creates a cause of action for a violation of section (a).  The LMRDA includes three prerequisites for union members

4

seeking to file a complaint regarding a violation of § 501(a): (1) there must be a failure or refusal of the governing board "to sue or recover damages or secure an accounting or other appropriate relief," (2) leave of court must be sought, and (3) good cause must be shown. *Id.* § 501(b).

## III. Analysis

Following the earlier decision of the Fourth Circuit, the only remaining question is whether Plaintiff has shown "good cause" to file the complaint. As this court briefly previewed in its earlier opinion, there is a circuit split on the precise standard to apply when evaluating the good cause requirement of § 501(b). (ECF No. 27, at 7). The Fourth Circuit has not weighed in. After considering the different standards, this court will apply the test used in *Horner v. Ferron*, 362 F.2d 224 (9th Cir. 1966), which is used across four circuits. Under the *Horner* test, the court finds that Plaintiff does have good cause under § 501(b). Accordingly, the court will grant leave for Plaintiff to file her complaint.

### A. Circuit Split

The United States Courts of Appeals for the Third, Ninth, Eleventh, and D.C. Circuits follow the test first laid out by the Ninth Circuit in *Horner*. *See Loretangeli v. Critelli*, 853 F.2d 186, 192 (3d Cir. 1988); *Erkins v. Bryan*, 663 F.2d 1048, 1053 (11th

5

Cir. 1981); *George v. Loc. Union 639*, 98 F.3d 1419, 1422 (D.C. Cir. 1996). "The requirement of section 501(b) that a plaintiff . . . show 'good cause' before being entitled to file the complaint is intended as a safeguard to the affected union against harassing and vexatious litigation brought without merit or good faith." *Horner*, F.2d at 228. Thus, the good cause requirement must entail a showing that there is some level of merit to the claim. The question is what level and type of scrutiny to apply to that determination. The Ninth Circuit laid out the standard for evaluating good cause:

> [T]he court may, if it chooses, look somewhat beyond the complaint in determining whether the plaintiff has made the 'good cause' showing required by section 501(b). Thus if the defendant can establish, by undisputed affidavit, fact which demonstrate that the plaintiff is not a member of the defendant union, or that the action is outlawed by a statute of limitations, or that the action cannot succeed because of the application of the principles of res judicata or collateral estoppel, or that plaintiff has not complied with some controlling condition precedent to the bringing of such a suit, then although these defects do not appear on the face of the complaint, they may warrant denial of the application.
>
> However, we think it inappropriate to consider, at such a hearing, defenses which require the resolution of complex questions of law going to the substance of the case. Defenses of this kind should be appraised only on motion for summary judgment or after a trial. . . . Defenses involving disputed questions of fact should be appraised only

6

> after a trial at which the parties and the
> court can have the benefit of a complete
> inquiry, assisted by such pre-trial discovery
> as may be undertaken.

*Horner*, 362 F.2d at 229 (footnotes omitted).  While this test outlines appropriate considerations and defenses that represent a bar to good cause, a conception of what courts should affirmatively look for has come from subsequent case law.  In finding good cause, courts applying the *Horner* test have considered whether the plaintiff has "set forth facts which tend to show that union funds were misspent for [the union official's] benefit." *Cowger v. Rohrbach*, 868 F.2d 1064, 1068 (9th Cir. 1989).  While the specific language has differed, courts essentially consider whether plaintiffs have included facts that tend to show a breach of fiduciary duty.  "At this early stage of the proceedings, this is sufficient to satisfy the threshold 'good cause' requirement of section 501(b)." *Id.*; *see also Stone v. Vitale*, 738 F.Supp. 1047, 1049 (E.D.Mich. 1989) (finding good cause where there are "specific claims of unauthorized approval of expenditures, the direct personal benefit of an official, and the interpretation of bylaws and management of funds which is so manifestly unreasonable as to constitute breach of fiduciary duty"); *Hanahan v. Lucassen*, 764 F.Supp. 194, 196 (D.D.C. 1991) (finding good cause where "the plaintiffs have presented a colorable claim").  The *Horner* test is comparatively more lenient than other standards for meeting good

cause, which courts in these circuits have found to be most faithful to the statutory language. "The good cause standard is a threshold requirement that a plaintiff can satisfy through an *ex parte* application. It would therefore be illogical to impose a heightened pleading standard, requiring a plaintiff to show a high likelihood of success on the merits." *George*, 98 F.3d at 1422.

The United States Court of Appeals for the Second Circuit has adopted the standard outlined in *Dinko v. Wall*, 531 F.2d 68 (2ᵈ Cir. 1976).[2] *See, e.g., Patrick v. Loc. 51, Am. Postal Workers Union, AFL-CIO*, No. 19-cv-10715-NSR, 2021 WL 5106638, at *7 (S.D.N.Y. Nov. 3, 2021). The standard is slightly more demanding than that of *Horner*. In *Dinko*, the Second Circuit adopted a "reasonable likelihood of success" test:

> Here, two policies compete: supervision of union officials in the exercise of their fiduciary obligations and protection, through a preliminary screening mechanism, of the internal operation of unions against unjustified interference or harassment. We

---

[2] This court's earlier opinion stated that the United States Court of Appeals for the Eighth Circuit also followed the test laid out in *Dinko*. (ECF No. 27, at 7 n.3). More precisely, at least one district court in that circuit has applied the *Dinko* test, and the Eighth Circuit has not specifically endorsed any of the tests. *See Gould ex rel. St. Louis - Kansas City Carpenters Reg'l Council v. Bond*, 1 F.4th 583, 589 (8ᵗʰ Cir. 2021) ("[O]ur sister circuits to some extent disagree over the proper standard to apply in determining whether a union member has shown the good cause required to be granted leave to file a § 501(b) suit. The district court applied the *Dinko* standard. Our circuit has not taken sides in this debate, and this case does not require us to do so." (citation omitted)).

> believe that both these policies are served if
> good cause in section 501(b) is construed to
> mean that plaintiff must show a reasonable
> likelihood of success and, with regard to any
> material facts he alleges, must have a
> reasonable ground for belief in their
> existence.

*Dinko*, 531 F.2d at 75.  No other circuit has adopted the *Dinko* standard.

In 1978, a court in this district – in a different procedural posture - endorsed the *Dinko* standard. *Brink v. DaLesio*, 453 F.Supp. 272 (D.Md. 1978).  In *Brink*, the defendant union official filed a motion to dismiss, arguing in part that the requirements under § 501(b) had not been met before the plaintiff filed his complaint.  *Id.* at 275.  The court found that the plaintiff easily met the "reasonable likelihood of success" standard under *Dinko* because the court had already granted the plaintiff a temporary restraining order.  *Id.* at 277.  While the court did not discuss why it was using the *Dinko* standard as opposed to the *Horner* standard, the court did note that "[t]he purpose of the [§] 501(b) prerequisites is to shield union officers from the harassment of unwarranted actions."  *Id.* at 276.  This characterization conflicts with the Fourth Circuit's observation in this case that "§ 501(b) is designed to protect two often conflicting interests: those of union members and those of union officials." (ECF No. 32-2, at 8, 150 F.4th at 226).  Given that the *Brink* court was proceeding in

a different procedural posture and lacked the benefit of the Fourth Circuit's recent decision, the persuasive force of its approach is considerably diminished.

Finally, the United States Court of Appeals for the Fifth Circuit follows the "objectively reasonable" test from *Hoffman v. Kramer*, 362 F.3d 308 (5th Cir. 2004). Under the *Hoffman* standard:

> [T]he district court should ensure that the plaintiff show—either in verified pleadings, affidavits, or a hearing, if ordered by the district court—that the union's refusal to act was objectively unreasonable, assessed from the point of view of the membership as a whole. This deference is appropriate only when the democratic accountability of a union is not seriously at issue.

*Id.* at 317.  This represents a higher bar and a different focus than the tests explained in both *Horner* and *Dinko*.  According to the Fifth Circuit, "[o]bjectively reasonable determinations by disinterested union leaders not to bring an action seem to us a strong indication that the claims may be ill-suited as a springboard for judicial intervention into the management of a labor organization that is democratically accountable to its membership."  *Id.*  The *Hoffman* court emphasizes elections as a check on union officials, asserting the good cause requirement reflects "faith that union democracy will ordinarily serve as an adequate safeguard against mismanagement by rogue officials."  *Id.* at 318.  Judge Wilkinson applied the *Hoffman* "objectively

reasonable" standard to the facts of this case in his dissent from the Fourth Circuit's opinion, (ECF No. 32-2, at 14-15, 150 F.4th at 229), emphasizing that these same allegations had been raised during the most recent union elections, (*Id.* at 12-13, 150 F.4th at 228).

**B.    Adoption of the *Horner* Test**

The test from *Horner*, followed by most circuits that have considered this question, best complies with the statutory directive.  As the Fourth Circuit stated in their earlier opinion in this case, "§ 501(b) is designed to protect two often conflicting interests: those of union members and those of union officials."  (ECF No. 32-2, at 8, 150 F.4th at 226).  The comparatively high level of scrutiny for proposed complaints in the *Hoffman* test weighs too heavily in one direction without considering the interests of the union members.  The *Horner* test offers the best balancing of both parties' interests.

Both Defendants and Judge Wilkinson argue that this court should apply the "objectively unreasonable" test from *Hoffman.* (ECF Nos. 45, at 19; 32-2, at 14, 150 F.4th at 229).  They emphasize the relationship to shareholder derivative suits, (ECF Nos. 45, at 19; 32-2, at 15, 150 F.4th at 229), and the fact that the LMRDA seeks to ensure that union leaders are not subject to harassing lawsuits, (ECF Nos. 45, at 17; 32-2, at 14, 150 F.4th at 228-229).

11

But this argument overlooks the second purpose of the LMRDA: protecting union members from breaches of fiduciary duty by their leaders. Defendants also point to the *Hoffman* court's assurance that union democracy is an adequate safeguard against breach of fiduciary duty by union officials. (ECF No. 45, at 19-20). While the allegations in Plaintiff's complaint were previously raised during Ms. Cervantes' successful run for reelection, the facts of other cases brought under § 501(b) may not be aired during elections. The *Horner* test offers the best balance of the interests of union leaders and members, regardless of whether any allegations have been raised during elections.

### C.    Application of the *Horner* Test

Applying the *Horner* test, Plaintiff has good cause to file her complaint. Plaintiff has provided facts supporting a possible breach of fiduciary duty by a union officer. Defendants have not argued that any of the threshold issues contemplated in *Horner* bar the complaint. Defendants do argue that the equitable doctrine of laches should apply, but the court finds that applying laches to the current suit would be unwarranted.

### 1.    Plaintiff Provided Factual Support

Plaintiff has provided declarations and facts that support a finding of good cause to file a complaint. The verified complaint contains allegations that "there were numerous times that

12

Defendant Cervantes violated her fiduciary responsibilities by traveling first class air at union expense to Houston, Texas, without any legitimate reason for her to perform this travel." (ECF No. 1-1 ¶ 20). The complaint provides facts supporting the allegations, raising specific trips and occasions that Plaintiff believes were inappropriate uses of union funds that benefitted Ms. Cervantes. (Id. ¶¶ 25-34). In support of her verified application to file a complaint, Plaintiff submitted declarations and extensive supporting exhibits for herself and three other union members, as well as a filing from another union member's action in another district. (ECF No. 24-1, at 1-2). These facts "tend to show that union funds were misspent" for Ms. Cervantes' benefit, *Cowger*, 868 F.2d at 1068, which could support a claim for breach of fiduciary duty. "At this early stage of the proceedings, this is sufficient to satisfy the threshold 'good cause' requirement of section 501(b)." *Id*. Plaintiff has shown good cause to file the complaint under § 501(b).

### 2. Laches

Defendants do not raise any of the bars to good cause identified in *Horner*, 362 F.2d at 229; however, Defendants argue that Plaintiff lacks good cause because her claim should be barred by laches. (ECF No. 45, at 26). This court previously explained the doctrine of laches:

13

> The judicially created doctrine of laches "may
> be applied by a court to bar a suit in equity
> that has been brought so long after the cause
> of action accrued that the court finds that
> bringing the action is unreasonable and
> unjust." *Lyons P'ship, L.P. v. Morris
> Costumes, Inc.*, 243 F.3d 789, 798 (4th Cir.
> 2001). But when a cause of action is "brought
> pursuant to a statute for which Congress has
> provided a limitations period, a court should
> not apply laches to overrule the legislature's
> judgment as to the appropriate time limit to
> apply for actions brought under the statute."
> *Id.; see also Haley Paint*[ *v. E.I. Du Pont De
> Nemours and Co.*], 279 F.R.D. [331,] 337[
> (D.Md. 2012)].

*Long v. Welch & Rushe, Inc.*, 28 F.Supp.3d 446, 463 (D.Md. 2014).

Laches is an affirmative defense against a case, and the defendant

has the burden of proving "(1) lack of diligence by the party

against whom the defense is asserted, and (2) prejudice to the

party asserting the defense." *White v. Daniel*, 909 F.2d 99, 102

(4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265,

282 (1961)).

Defendant first argues that Plaintiff showed a lack of

diligence by bringing this action approximately three years after

she became aware of the possible claim, outside the analogous

statute of limitations. (ECF No. 45, at 27). "When federal courts

. . . consider laches, they are guided by the limitations period

that they would borrow for actions at law and presume that if an

equitable claim is brought within the limitations period, it will

not be barred by laches." *Lyons P'ship, L.P.*, 243 F.3d at 799.

14

Congress did not include a statute of limitations for claims brought under the LMRDA. *Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F.Supp.3d 543, 548 (E.D.Va. 2020). When Congress has not supplied a statute of limitations, the Supreme Court of the United States has "generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law." *Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989) (quoting *DelCostello v. Teamsters*, 462 U.S. 151, 158 (1983)). Defendants argue that the statute of limitations for shareholder derivative actions is analogous, (ECF No. 45, at 27-28), asserting that Plaintiff is therefore bound by *the union's* deadline for a breach of fiduciary duty claim under Maryland law, (*Id.*). By Defendants' count, Plaintiff would have needed to file the suit by November 2023 to fall within Maryland's three-year statute of limitations for breach of fiduciary duty, because IAM knew about the claims as early as November 2020. (*Id.* at 28). However, starting Plaintiff's "statute of limitations" when the union was made aware of the claims is nonsensical, because it does not account for when the union member becomes aware of the possible claim. *See White*, 909 F.2d at 102 ("An inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable diligence could have discovered the facts giving rise to his cause of action."). Rather, any analogous statute of

15

limitations should begin running when Plaintiff learned of the possible claim, which Defendants acknowledge is "March 2021 at the latest." (ECF No. 45, at 27). Applying the three-year statute of limitations for breach of fiduciary duty, Plaintiff had until March 2024 to bring her claim. Plaintiff filed her application on February 15, 2024. (ECF No. 1). Plaintiff filed a timely application to file under § 501(b), barring the application of laches.

Defendants also briefly argue that they have been prejudiced by the delay. (ECF No. 45, at 29). Their lament is insubstantial, even if relevant. The delay found here is far from the delay found to warrant an application of laches in other cases. *See, e.g., White*, 909 F.2d at 102 (finding the delay was unreasonable when it took seventeen years to file suit); *Knickman v. Prince George's County*, 187 F.Supp.2d 559, 567 (D.Md. 2002) (applying laches when the plaintiff took two years to serve the defendant after filing suit, and the relevant EEOC file had been destroyed). Defendant has clearly been on notice of this controversy given the three other lawsuits they identify, as well as the demand letters from Plaintiff and resulting audit, making it much less likely that memories have faded or documents have been destroyed. The equitable defense of laches does not bar this complaint.

16

## IV.  Conclusion

For the foregoing reasons, Plaintiff's verified application for leave to file a complaint pursuant to 29 U.S.C. § 501(b) will be granted.[3]  A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge

---

[3] The clerk will be directed to detach and file Plaintiff's proposed complaint that appears at ECF No. 1-1.  There is some ambiguity about whom the proposed defendants are in that complaint. The caption and the complaint identify the union along with all officers as defendants.  In the introduction, Plaintiff states "[i]n Count I, Plaintiff sues defendant IAM General Secretary Treasurer Dora Cervantes for breach of fiduciary duty under 29 U.S.C. § 501(a)." (ECF No. 1-1 ¶ 1).  In Count I itself, Plaintiff states, in part, "the failure of the governing board of Defendant IAM to remedy the situation or seek reimbursement gives the Plaintiff the right to pursue litigation under 29 U.S.C. § 501(b)[.]" (*Id*. ¶ 47).  Finally, the Prayer for Relief "demands judg[]ment against the Defendants, jointly and severally, on Count I" and seeks not only reimbursement of the funds but also an accounting, and an order prohibiting the union from improperly paying for personal travel by its officers. (*Id*. at 18).  Both parties have focused their arguments on the assumption that Ms. Cervantes is the only defendant for Count I.  The only defendant named in Count II is the union itself.  Plaintiff will be directed to clarify this ambiguity and will do so by requesting the issuance of a summons only for the proper defendants.  If additional clarification is necessary, Plaintiff should consider filing an amended complaint.